UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) Case No. 1:98-cr-00038-JMS-MJD | |
| | ) | |
| WILLIE BODDIE, | ) | -02 |
| Defendant. | ) | |

**RESPONSE IN OPPOSITION TO MOTION
FOR COMPASSIONATE RELEASE AND REDUCTION
IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

Willie E. Boddie is currently in the custody of the Federal Bureau of
Prisons (BOP) at FCI Yazoo City in Mississippi.  He seeks immediate release
from prison under 18 U.S.C. § 3582(c)(1)(A)(i), citing the COVID-19 pandemic
and family circumstances as "extraordinary and compelling reasons" he
believes entitle him to relief.

The United States respectfully opposes the motion.  Boddie's attempt to
meet the "extraordinary and compelling" standard is a close call based largely
on his BMI.  In all events, he has not met his burden to show that a reduction
is warranted in light of the sentencing factors of 18 U.S.C. § 3553(a).

The Court should deny his motion.

# BACKGROUND

## *Boddie's Criminal Offenses, Trial, and Sentencing*[1]

On June 30, 1998, a grand jury issued the superseding indictment that governs this case.  Count 1 charged Boddie and ten others with conspiracy to possess with intent to distribute and to distribute more than five kilograms of cocaine, a Schedule II, Narcotic Controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846. (Superseding Indictment, p. 2 and 19).  Counts 7, 8, 9, 12, 16, 18, and 21 charged Boddie with money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(1), 1956(a)(1)(B)(i), and 1956(h). (Superseding Indictment, p. 24-25, 29,42, 43.)  Attorney Jeffrey Baldwin was appointed to represent Boddie.  (JAMS D., Nov. 25, 1998.)

The matter proceeded to an eight-week jury trial.  The evidence established that: Boddie was involved in the conspiracy from the beginning, (PSR ¶ 30); he was second in command, acting as a manager/supervisor and primary distributor in the conspiracy, (PSR ¶ 30; Sent. Tr. 7, 13, 27, 39-41, 43); his involvement included at least 500 kilograms of cocaine and more than four kilograms of cocaine base, (PSR ¶ 30; Sent. Tr. 8-18, 38-39; 42-43); he cooked cocaine into crack cocaine at more than one location, (PSR ¶ 30; Sent. Tr. 10, 16-17, 40); he laundered at least $10 million of the conspiracy's

---

[1] The facts are taken in part from the Seventh Circuit's opinion affirming Boddie's sentence and conviction on direct appeal. *United States v. Thompson, et al.*, 286 F.3d 950 (7th Cir. 2002).

proceeds, (PSR ¶ 30; Sent. Tr. 20-22, 44-46-47), and he routinely carried firearms and kept handguns and assault weapons at his residence and the residences of his associates, (PSR ¶30).

During the conspiracy, Marcus Willis, who worked for law enforcement, was murdered in one of Boddie's co-defendant's vehicle. *United States v. Thompson*, 286 F.3d 950, 956 (7th Cir. 2002). Boddie was present when the discussions of murdering Willis took place, both before and after the murder occurred. (PSR ¶ 30.)

Other than two counts of money laundering (Counts 9 and 16), the jury found Boddie guilty of the charges against him.  (PSR ¶ 2.)  At sentencing, the Court recognized the large amount of cocaine distributed by the conspiracy: "I think it is a fairly conservative estimate to say for the course of the time that Mr. Boddie was involved in this cocaine conspiracy that 500, 550 kilograms of cocaine were brought into this community and distributed." (Sent. Tr. 42-43).

The Court also acknowledged Boddie's significant role in the conspiracy. (Sent. Tr. 42-43).  Boddie was sentenced to life imprisonment on the conspiracy count and 240 months imprisonment on the money laundering counts. (Sent. Tr. 56; Judgment).  The Court imposed a five-year term of supervised release. (Sent. Tr. 56; Judgment).

The Seventh Circuit affirmed Boddie's convictions and sentences. *United States v. Thompson*, 286 F.3d 950.

### *Boddie's Prison Disciplinary Record and Re-entry Plan*

Boddie's prison disciplinary records show two infractions for phone abuse and one infraction for possessing a hazardous tool.  (Exhibit A, BOP Disciplinary Record.)

Boddie has taken several educational courses during his incarceration. (D. 182-3 at 1-4.)  Upon his release he intends to reside with his fiancée, Dana Warner, in Woodland Hills, California.  (D. 178 at 36.)

According to Boddie, "he has an offer to work with [Dana] at "Injoi CBD" located in Winnetka, California, where he will be making $15 an hour as a salesperson."  (*Id*.)  He and Dana also intend to start a "nonprofit venture," "IT'S NOT JUSSTUSS" whose goal is to "help parolees obtain identification, their GED, employment services, counseling services, assistance with housing, clothing, food, and other services permitted."  (*Id*. at 36-37.)

### *Boddie's Medical Conditions*

At the time of his presentence investigation report in October 1999, Boddie reported that he was in "fairly good health" and had no medical conditions that required special medical attention or prescription medication. (PSR ¶75.)

4

Boddie, now 49 years old, points to four medical issues that he claims put him at increased risk during the COVID-19 pandemic: chronic asthma, sickle cell anemia, obesity, and being a former smoker.

<u>Chronic Asthma</u>

Boddie's BOP medical records show consistent treatment for chronic asthma. (Exhibit B, BOP Medical Records at 1, 6, 8, 45, 50,77, 91,103, 115-18, 122, 150, 168-69, 176, 179, 212-14, 227, 240, 254, 261, 283, 305-07, 310, 328.) However, the records also show that Boddie's asthma is well managed with medication.  For the past several years he has been prescribed an Albuterol inhaler, 90 mcg, 2 puffs four times a day as needed.  (Exhibit B at 275, 296, 310, 313, 328.)  The only asthma attack recorded for Boddie was in June 2014.  (Exhibit B at 122.)

In January 2017, Boddie reported "no new problems," and that he only used the inhaler "when needed or working out." (Exhibit B at 261.) In January 2018, Boddie reported he uses an inhaler once a day with good control of asthma; "no new problems"; no shortness of breath or difficulty breathing.  (Exhibit B at 283.)  In January 2019, Boddie reported "no complaints" and denied wheezing, coughing, or night exercised induced symptoms.  He reported using the inhaler on a daily basis.  (Exhibit B at 310.)  In August 2019, Boddie reported "no new problems" and that he used the inhaler only when needed, sometimes weekly.  He denied cough,

shortness of breath or fatigue. (Exhibit B at 305.)   Boddie's most recent

prescription for Albuterol was issued on or around November 9, 2020.

(Exhibit B at 337.)

Boddie had chest x-rays in 2009, 2010, 2016, and 2018.  Each time the

results were "negative" or "unremarkable."  (Exhibit B at 7, 75, 252, 283.)

And, at his last five examinations,[2] Boddie's pulmonary condition was

reported as "within normal limits," "clear to auscultation," and/or no wheezes,

crackles, rhonchi, or rales.  (Exhibit B at 223, 262, 284, 306, 312.)

Sickle Cell Anemia

Boddie admits that he has not been diagnosed with sickle cell anemia.

(D. 178 at 22.)  And to be sure, his BOP medical records do not report that he

has the condition.  (Exhibit B at 23, 25, 47, 53, 64, 82, 127, 133, 137, 138, 160,

161, 164, 179, 191, 209, 214, 154, 257.)  Nevertheless, Boddie contends that a

"doctor informed him that his blood work was irregular and that he needed

further testing done as his blood work showed signs of a hemoglobin

deficiency similar to that in sickle cell anemia." (*Id*.)

While BOP medical records confirm that Boddie is anemic, he has not

indicated or established a cause for that status.  BOP medical records show

that a Hemoglobin Electrophoresis lab test was order for Boddie in March

---

[2] The last five examination occurred on:  January 13, 2016; January 31, 2017;
January 12, 2018; August 15, 2019; and January 17, 2019. (Exhibit B at 223,
262, 284, 306, 312.)

2020 which would determine whether Boddie has sickle cell anemia.  (Exhibit B at 329.)  Undersigned counsel has requested the BOP to provide the results of that test but as of the filing of this response, the results have not been received.

Boddie contends that he has experienced some of the symptoms of sickle cell anemia, namely: periodic episodes of pain, chest pain, headaches, and dizziness.  (D. 178 at 23.)  However, Boddie's BOP medical records do not support his contention.  There is no record of him lodging complaints of pain, chest pain, headaches, or dizziness. (Exhibit B, generally.)

Obesity

Boddie's BOP medical records show that as of August 2020, he weighed 219 pounds.  (Exhibit B at 314.)  His last recorded height was 4 feet and 11 inches, in 2016. (Exhibit B at 218.) The result is a BMI of 44.2.  (Exhibit B at 320.) However, Boddie contends that he is 5 feet and 9 inches tall and weighs 210 pounds, which results in a BMI of 31. (D. 178 at 24.)  Although those data sets diverge considerably, both result in a BMI north of 30.

Former Smoker

Boddie contends that he is a former smoker.  (D. 178 at 24.)  And BOP Medical records tend to support this—he reported using tobacco in July 2009, and March 2015.  (Exhibit B at 24, 193.) However, in May 2009, August 2010, January 2016, and January 2019, Boddie denied using tobacco. (Exhibit B at

7

26, 65, 218, 310.)  In all events, the records suggest that he smoked at some point.

* * *

Overall, the BOP medical staff classified Boddie at "Care Level I," "healthy or simple chronic care."  Care Level 1 is the lowest level for an inmate's need for medical care.  (Exhibit C, BOP Inmate Profile at 1.)

### *Boddie's Family Circumstances*

Boddie presents two family circumstances that he contends are "extraordinary and compelling" reasons warranting his immediate release. (D. 178 at 2.)

First, he indicates that his approximately 29-year-old son, Ryan Merriweather, "has been in out of the hospital for the past several years due to recurring flare ups of Neurological Behcet's Disease, and just recently had a stroke as a result of this disease."  (*Id*.)  According to Boddie, the stroke "had severely debilitating consequences on [Ryan's] every-day life."  (D. 178 at 30.)

Ryan is on permanent disability, and "is susceptible to severe illness as a result of a COVID-19 infection" and "requires someone with the capability and desire to actually take care of his everyday needs."  (*Id*.)  Boddie reports that Ryan's mother, Deborah Merriweather, provides care for Ryan "but she

works and does not have sufficient time to be there for Ryan's everyday needs." (*Id.*)

Boddie contends that his immediate release would allow him "to get his son the proper care needed to alleviate the every-day pain that Ryan experiences." (*Id.*)  Boddie has provided some of Ryan's medical records from St. Joseph's Westgate Medical Center, located in Glendale, Arizona.  (D. 182-5 at 1-38.)

Second, he states that his fiancée, Dana, was diagnosed with multiple sclerosis in 2004.  (D. 178 at 2-3, 30.) According to Boddie, Dana was placed on permanent disability in 2014.  (*Id.* at 30.)  Dana's parents are deceased and she "has no other caretaker to help assist her in her progressive decline in health . . . ." (*Id.*)   Boddie says that his immediate release would allow him "to assist [Dana] in any way necessary." (*Id.*)

### *Boddie's Motion for Compassionate Release*

On December 2, with retained counsel, Boddie filed a motion for compassionate relief.  (D. 178.)  He claimed that he had "submitted his request for a reduction in sentence to the Warden" on July 5, 2020, and that "more than 30 days have passed since he submitted his request." (D. 178 at 31.)  Counsel for the United States has confirmed that Boddie submitted his request to the warden in the summer of 2020.  As such, the government agrees that Boddie has exhausted his administrative remedies.

On December 3, 2020, this Court ordered the government to respond to Boddie's motion within fourteen days.  (D. 181.)

### COVID-19 and the Bureau of Prison's Response

As the Court is well aware, COVID-19 is a dangerous illness that poses grave risks to everyone in the world. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. The current measures are summarized at https://www.bop.gov/coronavirus/covid19_status.jsp, last accessed Dec. 16, 2020 (updated November 25, 2020) which include the following:

> **SOCIAL VISITING:** The BOP recognizes the importance for inmates to maintain relationships with friends and family. During modified operations in response to COVID-19, the BOP suspended social visitation, however, inmates were afforded 500 (vs. 300) telephone minutes per month at no charge to help compensate for the suspension of social visits. As a modification of the BOP's Phase Nine Action Plan, and in accordance with specific guidance designed to mitigate risks, social visits are being reinstated, where possible to maintain the safety of our staff, inmates, visitors, and communities.

> Each individual institution has made plans consistent with their institutional resources (including physical space) and will continuously monitor their visiting plan, and make prompt modifications, as necessary, to effectively manage COVID-19. Such modification may include limiting or postponing visitation, providing visitation by appointment, or other adjustments as appropriate.

> All visits will be non-contact and social distancing between inmates and visitors will be enforced, either via the use of plexiglass, or similar barriers, or physical distancing (i.e., 6 feet apart). Inmates in quarantine or isolation will not participate in

social visiting. The number of visitors allowed in the visiting room will be based on available space when utilizing social distancing. The frequency and length of visits will be established to ensure all inmates have an opportunity to visit at least twice a month. Visitors will be symptom screened and temperature checked; visitors who are sick or symptomatic will not be allowed to visit. Both inmates and visitors must wear appropriate face coverings (e.g. no bandanas) at all times and will perform hand hygiene just before and after the visit. Tables, chairs and other high-touch surfaces will be disinfected between visitation groups; all areas, to include lobbies, will be cleaned following the completion of visiting each day.

In addition to screening and testing inmates, temperature checks and COVID-19 screening is being conducted for staff, contractors, and other visitors to our correctional institutions, with those who register a temperature of 100.4° Fahrenheit or higher denied access to the building. As much as possible, staff are being assigned to the same posts and not rotating, as an additional measure to mitigate the spread of the virus.

It is our highest priority to continue to do everything we can to mitigate the spread of COVID-19 in our facilities; therefore, every CDC recommended precaution will be incorporated into our revised visiting procedures. More information about each institution's revised visiting procedures and schedule will be forthcoming and posted on www.bop.gov.

**LEGAL ACCESS:**  As courts begin to conduct more criminal and civil proceedings, inmates will need increased access to counsel and legal materials.

Legal calls and/or virtual legal visits: Telephone calls and/or video conferencing with outside counsel is accommodated to the extent possible.

In-Person Legal Visits: Consistent with standing guidance, in-person legal visits are accommodated upon request, based on local resources, and will follow preventative protocols (e.g. face coverings required).

**MODIFIED OPERATIONS:** BOP has implemented modified operations to maximize social distancing in our facilities, as much

11

as practicable. To that end, inmates are limited in their movements to prevent congregate gathering and maximize social distancing. Essential inmate work details, such as Food Service, continue to operate with appropriate screening. Inmate movement in small numbers is authorized for the following purposes:

A. Commissary

B. Laundry

C. Showers three times each week

D. Telephone, to include legal calls, and access to TRULINCs

Note that inmate movement is still expected to allow, when necessary, for the provision of required mental health or medical care, including continued Sick Call. Select Unicor operations also continue.

**PROGRAMMING**:  Inmate programming is an essential function in our facilities, and delivery of First Step Act approved Evidence-Based Recidivism Reduction (EBRR) Programs and Productive Activities (PAs) is required by law. Institutions are offering programming to the extent practicable.

Institutions with active COVID-19 cases may make exceptions to these programming requirements for the safety of inmates and staff.

**INTAKES:** Prior to entering the institution, or in Receiving and Discharge: All new intakes to an institution, including voluntary surrenders, BOP-to-BOP transfers, or transfers from outside the BOP system are screened by medical staff for COVID-19 - including a symptom screen, a temperature check, and an approved viral PCR test (either an Abbott ID NOW point-of-care [POC] test or a commercial PCR test) performed on a sample obtained from a nasopharyngeal, mid-turbinate, or anterior nares swab.

•Inmates who arrive symptomatic AND/OR test positive will be placed in MEDICAL ISOLATION.

- Inmates who arrive asymptomatic AND test negative will be placed in QUARANTINE.

If inmates become symptomatic during quarantine, they are re-tested (Abbott or commercial) and placed in MEDICAL ISOLATION immediately.

If inmates remain asymptomatic, they remain in QUARANTINE for at least 14 days. They are then tested out of quarantine with a COMMERCIAL PCR TEST at 14 days or after; if the test is negative, the inmate can be released to the general population. If the test is positive, they are placed in MEDICAL ISOLATION immediately.

**MOVEMENT:** Movement of inmates can be a simple, short-distance transfer-or a complex, multi-day, multi-institution process. The risk of COVID-19 exposure and transmission increases as the complexity of the move increases. Transportation of inmates occurs with these considerations in mind:

- **Anyone with a known positive COVID-19 test, or who has fever or symptoms, will not be admitted on the transport.**

All inmates who are transferring between facilities, to other correctional jurisdictions, or releasing from BOP custody, are managed in one of the following three categories briefly described below:

1. Inmates with no prior history of COVID-19: Prior to transfer, these inmates are tested with an approved test (either an Abbott ID Now POC test or commercial send out lab test) and, if negative, placed in RELEASE/TRANSFER QUARANTINE and housed separately from inmates in EXPOSURE OR INTAKE QUARANTINE. Inmates remain in quarantine for a minimum of 14 days. They may be tested out of quarantine on Day 14 with a commercial PCR lab test (or an Abbott ID NOW test.

2. Inmates previously diagnosed with COVID-19 who have since recovered, and have met the current criteria for release from isolation: Inmates who are more than 90 days since initial symptom-onset or positive test and have met criteria for release from medical isolation and are more than 90 days from their initial

symptom onset (for symptomatic cases) or initial positive COVID-19 test (for asymptomatic cases) are managed like inmates who have not had COVID-19 (see #1 above). [Note: Inmates with active COVID-19 who continue to require isolation are not released or transferred unless absolutely necessary (e.g., immediate release, completion of sentence).]

3. Immediate releases: An inmate being released who cannot be managed as described above under #1 and #2 because of statutory or judicial requirements is provided a symptom screen, temperature check, and rapid POC test (Abbott ID Now) on the day of departure. The local health authorities in the receiving locality are notified, and the travel arrangements coordinated with them, if necessary (e.g., if quarantine or isolation conditions are required during transportation or upon their arrival). The inmate is required to wear a face covering when departing the facility and while in route to their destination.

**SCREENING**:  In addition to screening and testing inmates, temperature checks and COVID-19 screening is being conducted for staff, contractors, and other visitors to our correctional institutions, with those who register a temperature of 100.4° Fahrenheit or higher denied access to the building. As much as possible, staff are being assigned to the same posts and not rotating, as an additional measure to mitigate the spread of the virus.

**VOLUNTEERS AND CONTRACTORS**:  Volunteer visits, with the exception of visitation volunteers and faith-based volunteers, are suspended unless approved by the Deputy Director of the BOP. Visitation volunteers provide mentoring services through one-on-one visits with inmates in the visiting room during normal visiting hours. Alternate means of communication will be considered for inmates who request to speak with a religious advisor. Volunteers who are approved for access will be screened using the same procedures as staff prior to entry. Contractors performing essential services, religious worship services, or necessary maintenance on essential systems are allowed to enter the facility, but must undergo a COVID-19 screening and temperature check prior to entry. When performing screening activities, staff or contractors wear PPE in accordance with guidance from the BOP and CDC.

**TOURS**:  Tours are suspended. Any exceptions must be approved by the Deputy Director. If approved, participants will be screened using the same procedures as staff prior to entry.

**STAFF TRAINING**: All in-person training is suspended through October 31, 2020. Exceptions to in-person training includes: ICT I, ICT II, completion of mandatory requirements for Annual Training, OSHA mandated certifications, and any training that can be conducted remotely to fulfill ongoing mandatory credentialing requirements that cannot be waived.

**STAFF TRAVEL**: All non-essential official staff travel is suspended through October 31, 2020.

**PRIVATE DETENTION CONTRACTORS**:  This COVID-19 guidance is being shared with private prisons and RRCs for dissemination to staff and inmates in these facilities, so that similar protocols can be implemented.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement.  On March 26, 2020, and April 3, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement.  That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).

Congress has also acted to enhance the BOP's flexibility to respond to the pandemic.  Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, the BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).

Since March 26, 2020, when the Department of Justice prioritized home confinement in light of COVID-19. Currently, the BOP has 7,996 inmates on home confinement.  The total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have completed service of their sentence) is 18,859.[3]

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution.  The BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

---

[3] *See* BOP, "Frequently Asked Questions regarding potential inmate home confinement in response to the COVID-19 pandemic," *available at* https://www.bop.gov/coronavirus/faq.jsp, last accessed Dec. 16, 2020.

*Current Conditions at FCI Yazoo City*

FCI Yazoo City-Medium, the institution where Boddie resides, houses approximately 1,211 inmates.  As of December 16, 2020, FCI Yazoo City-Medium had 145 active COVID-19 cases: 139 inmates and six staff members.[4]

## DISCUSSION

Boddie seeks immediate release from prison under, the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i).  The Court should deny the motion for the following reasons.

### I.  Boddie's § 3582 Motion Fails on the Merits

Boddie's claims fail on the merits because (1) he cannot establish an "extraordinary and compelling reason" for release; and (2) his release cannot be squared with 18 U.S.C. § 3553(a).

### A.  Applicable Legal Standards

A federal court generally "may not modify a term of imprisonment once it has been imposed."  § 3582(c).  However, "under § 3582(c)(A)(i), a sentencing court 'may'—but is not required to—reduce a defendant's prison term for 'extraordinary and compelling reasons' if a reduction would be consistent with any applicable Sentencing Commission policy statements."

---

[4] *See* https://www.bop.gov/coronavirus/, last accessed Dec. 16, 2020.

*United States v. Cochran*, __ F. App'x __, 2020 WL 6158460, at *2 (7th Cir. Oct. 21, 2020) (order).

The Seventh Circuit recently held that there is no applicable policy statement in the Guidelines that covers prisoner-initiated applications for compassionate release. *United States v. Gunn*, __F.3d__, 2020 WL 6813995, at * 2 (7th Cir. Nov. 20, 2020). Accordingly, "the statute itself sets the standard: only 'extraordinary and compelling reasons' justify the release of a prisoner who is outside the scope of § 3582(c)(1)(A) (ii)."

The *Gunn* Court explained further that:

> The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of "extraordinary and compelling reasons"; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused. In this way the Commission's analysis can guide discretion without being conclusive.

*Id.*

Section 1B1.13, which although nonbinding remains relevant, provides that a reduction is appropriate if: (1) the defendant suffers from a serious medical condition that substantially diminishes his ability to care for himself; (2) the defendant is not a danger to the community under the § 3142(g) factors; and (3) the reduction would be consistent with the § 3553(a) factors. *See* U.S.S.G. § 1B1.13.

With respect to dangerousness, the Court is to consider the following factors under 18 U.S.C. § 3142(g):

**(1)** the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device; **(2)** the weight of the evidence against the person; **(3)** the history and characteristics of the person, including--**(A)** the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and **(B)** whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and **(4)** the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Finally, as the Court is well aware, § 3553(a) requires consideration of

the following factors:

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant; **(2)** the need for the sentence imposed **(a)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; **(b)** to afford adequate deterrence to criminal conduct; **(c)** to protect the public from further crimes of the defendant; and **(d)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; **(3)** the kinds of sentences available; **(4)** the kinds of sentence and the sentencing range established for the defendant's crimes; **(5)** any pertinent policy statement issued by the Sentencing Commission; **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and **(7)** the need to provide restitution to any victims of the offense.

### B.   Boddie's Purported "Extraordinary and Compelling" Health Risks Relating to COVID-19

Boddie contends that his asthma, sickle cell anemia, obesity, and being a former smoker constitute extraordinary and compelling reasons for his release.  (D. 155.)  He bears the burden of proof.  *See United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

#### 1.  Asthma

The CDC has recognized that adults with "moderate-to-severe" asthma "**might be at an increased risk** for severe illness from the virus that causes COVID-19." *See*, CDC, "Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions," available at https://www.cdc.gov/coronavirus/ 2019-ncov/need-extra-precautions/people-with-medical-conditions.html, last accessed Dec. 16, 2020 (emphasis in the original).[5]

However, Boddie has not provided sufficient documentation showing that he suffers "moderate-to-severe" asthma.  And his medical records appear to show that he suffers only "intermittent" asthma.

---

[5] The CDC has categorized certain medical conditions that place an individual "at increased risk for severe illness from the virus that causes COVID-19" or "might be at an increased risk for severe illness from the virus that causes COVID-19."  *Id*.  Moderate-to-severe asthma falls under the "might be an increased risk" category.

The National Asthma Education and Prevention Program has classified asthma as: Intermittent, Mild persistent, Moderate persistent, Severe persistent.[6]  *See* https://www.uofmhealth.org/health-library/hw161158, last accessed Nov. 19, 2020.  Asthma is considered intermittent if without treatment any of the following are true:

- Symptoms (difficulty breathing, wheezing, chest tightness, and coughing):

- Occur on fewer than 2 days a week.

- Do not interfere with normal activities.

- Nighttime symptoms occur on fewer than 2 days a month.

- Lung function tests (spirometry and peak expiratory flow [PEF]) are normal when the person is not having an asthma attack. The results of these tests are 80% or more of the expected value and vary little (PEF varies less than 20%) from morning to afternoon.

*Id.*

During the three most recent medical examinations, Boddie reported that his asthma was well controlled with medication.  On January 12, 2018, he reported using an Albuterol inhaler one time a daily with good asthma

---

[6] Asthma is considered moderate persistent if without treatment any of the following are true: symptoms occur daily; inhaled short-acting asthma medication is used every day; symptoms interfere with daily activities; nighttime symptoms occur more than 1 time a week, but do not happen every day; Lung function tests are abnormal (more than 60% to less than 80% of the expected value), and PEF varies more than 30% from morning to afternoon. *Id.*

control. He denied shortness of breath or difficulty breathing and reported "no new problems." (Exhibit B at 283.) On January 17, 2019, Boddie reported "no complaints" and the he uses his inhaler daily. He denied wheezing, cough, or night exercised induced symptoms. (Exhibit B at 310.) On August 8, 2019, Boddie reported "no new problems, and that he uses the inhaler only when needed, sometimes weekly. He denied cough, shortness of breath, and fatigue. (Exhibit B at 305.)

Boddie had chest x-rays in 2009, 2010, 2016, and 2018. Each time the results were "negative" or "unremarkable." (Exhibit B at 7, 75, 252, 283.) And, at his last five examinations, his pulmonary was reported as "within normal limits," "clear to auscultation," and/or no wheezes, crackles, rhonchi, or rales. (Exhibit B at 223, 262, 284, 306, 312.)

Boddie's BOP medical records provide no indication that he suffers from moderate or severe asthma. Instead, it shows that his condition is intermittent and is being treated on an as needed basis with an inhaler. *See United States v. Street*, 1:18-cr-00274-JMS-DLP, Dkt. No. 52 (S.D. Ind. May 21, 2020) (Stinson, J.) (finding no extraordinary and compelling reason warranting release of a 33 year-old inmate with non-moderate to severe asthma); *United States v. Ramos*, 2020 WL 1685812, at * 2 (S.D.N.Y. April 7, 2020) (denying motion for release for asthmatic 41 year-old inmate, finding that his condition was well controlled); *United States v. Glasper*, 3:11-CR-

30053-NJR, 2020 WL 6363703, at * 4 (S.D. Ill. Oct. 29, 2020) (denying motion for release where defendant's asthmas is well controlled).

Boddie has failed to carry his burden to prove an extraordinary and compelling reason for release stemming from his asthma.  *Jones*, 836 F.3d at 899.  Mild or intermittent asthma is not identified by the CDC as a risk factor that puts individuals at an increased risk for severe illness from the virus that causes COVID-19.

### 2.  Sickle Cell Anemia

According to the CDC, individuals with sickle cell anemia have an increased risk of severe illness from the virus that causes COVID-19.[7]

BOP medical records show that Boddie has repeatedly denied he has the sickle cell trait. (Exhibit B at 23, 25, 47, 53, 64, 82, 127, 133, 137, 138, 160, 161, 164, 179, 191, 209, 214, 154, 257.)  In addition, other than recent anemia, the records do not show that he has sickle cell anemia symptoms.  A Hemoglobin Electrophoresis test was ordered for Boddie in March 2020.  The results of that test are unknown.

---

[7] *See* CDC, "Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions,"  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#obesity, last accessed Dec. 16, 2020.

As such, Boddie has not met his burden of showing he has sickle cell anemia.  *Jones*, 836 F.3d at 899 (it is the defendant's burden to show extraordinary and compelling reasons for release).

### 3. Obesity

As noted, while Boddie reports his BMI at 31, (D. 178 at 24), BOP medical records indicated a BMI of 44.2.  Either way, Boddie's BMI is over 30 and according to the CDC, that places him at an increased risk of severe illness from COVID-19.[8]

### 4. Former Smoker

Boddie contends that he is a former smoker.  (D. 178 at 24.)  And while being a former smoker falls into the category of conditions that may increase the risk of severe illness from Covid-19, Boddie's condition is not a clear-cut case of higher risk. According to the CDC, quitting smoking, which Boddie's medical records suggest he did in 2015, likely reduces his risks substantially:

- Quitting smoking cuts cardiovascular risks. Just 1 year after quitting smoking, your risk for a heart attack drops sharply;

- Within 2 to 5 years after quitting smoking, your risk for stroke may reduce to about that of a nonsmoker's;

---

[8] *See* CDC, "Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions,"  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#obesity, last accessed Dec. 16, 2020.

- If you quit smoking, your risks for cancers of the mouth, throat, esophagus, and bladder drop by half within 5 years; and

- Ten years after you quit smoking, your risk for dying from lung cancer drops by half.[9]

And to be sure, at his most recent medical examination, on August 15, 2019, Boddie had "no complaints" and his pertinent pulmonary and cardiovascular reviews where "normal." (Exhibit B at 305.) And all his chest x-rays have been negative.

Because Boddie's risk is not extreme and because he has taken appropriate steps, his risk as a former smoker appear to be managed in accordance with the relevant CDC guidelines.

\* \* \*

It cannot be denied that Boddie has a BMI meeting the CDC's risk factors, even if apparently by a slim margin.  At the same time, Boddie's "activities in prison show that he is able to lead an active, meaningful life despite his health conditions."  *United States v. Newman*, No. 1:96-cr-00080-SEB-DKL-01, 2020 WL 6151250, at \* 3 (S.D. Ind. Oct. 19, 2020).  Under the modified analytical framework of *Gunn*, the Court looks simply at whether a defendant's circumstances are "extraordinary" and "compelling."  Although Boddie has identified qualifying conditions in light of the pandemic, the

---

[9] See CDC, "Smoking & Tobacco Use:  Health Effects of Cigarette Smoking," https://www.cdc.gov/tobacco/data_statistics/fact_sheets/health_effects/effects_cig_smoking/index.htm#reduced-risks, last accessed Dec. 16, 2020.

Court should keep the narrow nature of his qualification as important

perspective on whether he has met the high standard encapsulated in those

terms.

### C.  Boddie's Family Circumstances Do Not Present "Extraordinary and Compelling Reason" for His Release

Boddie contends that his immediate release would allow him "to get his

son the proper care needed to alleviate the every-day pain that Ryan

experiences" as a result of Neurological Behcet's Disease. (D. 178 at 30.)  To

be clear, although his son's condition appears to be serious, Boddie does not

state that he intends to move in with Ryan to care for him, or even to Arizona

where it appears Ryan resides.  Instead, he intends to move to California and

live with his fiancée.  It is unclear how he intends to "get the proper care"

Ryan needs from California, or why he cannot take those actions while

incarcerated.  Moreover, Ryan is on disability and his mother is caring for

him. He appears to be receiving "proper care" as evidenced by his medical

records.  While Ryan and his mother may welcome help from Boddie, the

nature of that help is limited by Boddie's plans to reside in California.

Ryan's circumstances and the level of care that Boddie intends to

provide to him do not represent an extraordinary and compelling reason to

release Boddie.  Looking to U.S.S.G. § 1B1.13 n. 1(C)(i) as guidance, Ryan's

caretaker, his mother, is not incapacitated and Ryan is not a minor.  For the

aforementioned reasons, Boddie family circumstances relative to Ryan are not extraordinary and compelling.

Nor do Boddie's fiancée's circumstances warrant his immediate release. Dana was placed on permanent disability in 2014 due to her multiple sclerosis diagnosis.  (D. 178 at 30.)  According to Boddie, he intends to work with her at Injoi CBD. (D. 178 at 3, 36.)  Thus, it appears that Dana is fit enough to work at Injoi CBD and, for the time being, appears to be able to care for herself.  Seeking release to care for someone who appears to be doing well on their own is not an extraordinary and compelling reason warranting immediate release.

And, the guidance provided in § 1B1.13 n. 1(C)(ii) does not support release.  Dana is not Boddie's spouse or registered partner and she is working and not incapacitated.

Finally, both Ryan and Dana's medical conditions might increase their risk of severe illness from COVID-19 due to their weakened immune system.[10]  Boddie does not contend that he plans to quarantine himself during the pandemic if released.  Instead, he intends to work as a salesperson at Injoi CBD where he will likely be interacting with the general public.  This

---

[10] *See* CDC, "Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions," available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, last accessed Dec. 16, 2020.

places him at risk of not only contracting coronavirus but also exposing Dana to the virus, and perhaps Ryan if he intends to visit him. It is difficult to see how FCI Yazoo City-Medium's number of active cases (145 quarantined inmates out of 1,211 inmates) poses a greater risk for Boddie than he would experience while working at Injoi CBD in California. Perhaps most notably, neither Ryan nor Dana have submitted a letter in support of Boddie's early release.

In any event, as discussed below, the § 3553 factors weigh against releasing Boddie.

### D.   The § 3553(a) Factors Weigh Against Boddie's Release

Boddie should remain in prison because his immediate release is insufficient to effectuate the purposes of sentencing outlined in 18 U.S.C. § 3553(a). *See United States v. Curry*, 2:06-cr-00011-JRS-CMM, Dkt. No. 77, at 9 (finding an extraordinary and compelling reason "does not, however, end the analysis because the statute also directs the Court to consider the sentencing factors in 18 U.S.C. § 3553(a)"); *Swain*, 2020 WL 2949775 at * 5 ("Even if Mr. Swain had presented extraordinary and compelling reasons warranting a sentence reduction, the Court would deny his motion because he presents a danger to the community."). The following analysis is drawn from Boddie's presentence report, trial record, and BOP documents.

1.   **The nature and circumstances of the offense and the history and characteristics of the defendant**

From 1992 to 1997, Boddie participated in a drug conspiracy that involved the trafficking of hundreds of kilograms of cocaine, the accumulation and laundering of substantial profits, and two short-lived business pursuits. *Thompson*, 286 F.3d at 956; (PSR ¶ 30; Sent. Tr. 7, 13, 27, 39-41, 43). Records indicate that Boddie was second in command, acting as a manager/supervisor and primary distributor in the conspiracy. (PSR ¶ 30; Sent. Tr. 7, 13, 27, 39-41, 43.)

Boddie was accountable for the distribution of "more than 500 kilograms of cocaine." (PSR ¶ 46.)  He laundered at least $10 million of the conspiracy's proceeds, (PSR ¶ 30; Sent. Tr. 20-22, 44-46-47), and he routinely carried firearms and kept handguns and assault weapons at his residence and the residences of his associates, (PSR ¶30).  During the course of the conspiracy, Marcus Willis, who worked on behalf of law enforcement was murdered.  *Id*.

Of particular relevance, the presentence investigation report notes that Boddie was present when the discussions of murdering Willis took place, both before and after the murder occurred. (PSR ¶ 30.)  Although the details of his involvement in that portion of the crimes at issue are not entirely clear, that underscores the seriousness of the crime.

While Boddie had no significant prior criminal history, due to his role in the offense, the large amount of cocaine and cocaine base distributed, the murder of a government informant, the prevalent use of guns, and the large amount of money laundered, the Sentencing Guidelines called for a sentence of life imprisonment. (PSR ¶¶39-63, 83.)  The Court declined to depart from the life sentence.  (Sent. Tr. 55.) It reasoned that the conspiracy operated "based on so much intimidation of others."  (Sent. Tr. 55.)  It also recognized the large quantity of cocaine distributed and the significant amount of violence in the community resulting from the conspiracy—the "unsolved murders, some even solved."  (Sent. Tr. 55.)

To his credit, Boddie has had only a few disciplinary infractions while incarcerated. (Exhibit A, BOP Disciplinary Record at 1.)  However, "regardless of personal characteristics, rehabilitation, or other factors that would ordinarily factor into the selection of a prison sentence," *Newman*, 2020 WL 6151250, at *3, Boddie should service the remainder of his life sentence.  *Id.* at *3 (denying compassionate release to 76-year old who had served 24 years of his mandatory life sentence imposed under 18 U.S.C. § 3559(c)); *see also* 28 U.S.C. § 994(t) ("The Commission ... shall describe what should be considered extraordinary and compelling reasons for sentence reduction.... Rehabilitation alone shall not be considered an extraordinary and compelling reason.") The history and characteristics of Boddie's crimes,

which includes the use of guns, selling large quantities of cocaine, money

laundering, and murder, do not support release.

> ### 2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant

In the compassionate release context, "[p]risoners typically only

obtain relief after serving a significant term of incarceration." *United States*

*v. Willis*, 382 F. Supp. 3d 1185, 1189 (D.N.M. 2019).  Here, Boddie has served

22 years in prison. "[G]iven the severity of the conduct, the amount of the

drugs distributed, [and Boddie's] unquestionable leadership role," *United*

*States v. Colon*, No. 97-CR-659-1, 2020 WL 7260804, at * 4 (N.D. Ill. Dec. 10,

2020), he has not established that release would be the proper result.  In

particular, given the violent nature of the conspiracy and the murder of

Marcus Willis, the factors articulated in § 3553(a) would not be served by a

release after serving 22 years of a life sentence.  *Cf. Colon*, 2020 WL 7260804,

at * 4 (denying compassionate release to 66-year-old defendant with

hypertension, obesity, and pre-Type 2 diabetes, who had served 23 years of a

life sentence for distributing 56 kilograms of cocaine and was a leader in the

Latin Kings gang).  As that violence suggests, releasing Boddie early would

not provide just punishment, promote respect for the law, reflect the

seriousness of his offenses, or protect the public from further crimes by the defendant.

All of these factors counsel in favor of Boddie's continued incarceration and the denial of his motion.

## CONCLUSION

For the foregoing reasons, the Court should deny Boddie's motion for compassionate release with prejudice.

Respectfully submitted,

JOHN E. CHILDRESS
Acting United States Attorney


By:   s/ Bob Wood
_____
      Bob Wood
      Chief, Appellate Division
      Office of the United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 17, 2020, a copy of the foregoing was filed

electronically. Notice of this filing will be sent to counsel of record by

operation of the Court's electronic filing system. Parties may access this filing

through the Court's system.

s/ Bob Wood
Bob Wood
Chief, Appellate Division
Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, IN  46204
Telephone: (317) 226-6333
E-mail: Bob.Wood@usdoj.gov